IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA   :
                            :       CRIMINAL NUMBER:
v.                           :       1:13-CR-108-WSD-JSA
                            :
JOHNATHON KELLY           :

## ORDER AND REPORT AND RECOMMENDATION

This case originated with a highway traffic stop on January 9, 2013.

Georgia State Patrol Trooper Will Grier testified that he pulled over the Defendant

and his passenger, a minor identified as R.W., for speeding.  Ultimately, based on

information obtained during the traffic stop and execution of search warrants,

Defendant was charged in this Indictment [1] with transporting R.W. in interstate

commerce for purposes of prostitution, in violation of Title 18, United States Code,

Sections 1591(a) and (b)(2) and 2423(a).

The case is now before the Court on a variety of motions by Defendant,

specifically, a Motion to Suppress Evidence [28], two Motions to Dismiss the

Indictment [18][25], and a Motion for Bill of Particulars [17].  The Court held an

evidentiary hearing on September 10, 2013 relating to Defendant's Motion to

Suppress, which alleges that Trooper Grier lacked probable cause to initiate the

traffic stop, and that the fruits of the search warrants should be suppressed because

the information provided by R.W. was unreliable and false.  After the Defendant

requested and received various continuances, he filed his post-hearing

memorandum on December 7, 2013, and the Government filed its response on

January 7, 2014.  The other pending motions are also now fully briefed.

For the reasons set out below, the undersigned **RECOMMENDS** that the

Defendant's Motion to Suppress [28] and Motions to Dismiss [18] [25] be

**DENIED**.  The Court **DENIES** the Defendant's Motion for a Bill of Particulars

[17].[1]

## FACTUAL BACKGROUND

A.    *The Traffic Stop*

On January 9, 2013, Trooper Grier, G.S.P., was patrolling Interstate 20 in

Taliaferro County, Georgia.  Transcript of Hearing, September 10, 2013 [38]

("Tr.") at 11-12.  Trooper Grier saw what was later identified as the Defendant's

Black Chevrolet Impala traveling in the oncoming direction "at what appeared to

be a high rate of speed."  *Id.* at 13.  Trooper Grier had been trained to visually

observe and estimate speeds and judged that the car was speeding above the 70

---

[1] This Court is authorized under Local Cr. Rule 59(2)(b) and 28 U.S.C. § 636(b)(1)(A) to adjudicate all pretrial matters except for dispositive motions and other specifically-excepted motions including motions to suppress evidence.  This authority allows the Court to issue an Order adjudicating Defendant's Motion for Bill of Particulars.  As to the Motions to Dismiss and Motion to Suppress, the Court is authorized under  Local Cr. Rule 59(2)(a) and 28 U.S.C. § 636(b)(1)(B) to hold an evidentiary hearing and issue a Report and Recommendation to the District Judge recommending a disposition.

mile per hour limit.  *Id.*  Trooper Grier's radar device also determined that the Impala was traveling at 85 miles per hour.  *Id.*

Trooper Grier did a u-turn through the median, caught up with the Impala, turned on his lights, and pulled the car over.  *Id.* at 13-14.  The audio and visual recording of this traffic stop from Trooper Grier's patrol car was entered into evidence at the hearing.  Ex. 3 (DVD recording)[2].  Trooper Grier explained, however, that the recording did not begin until after the initial speeding violation occurred.  Tr. at 38.  Indeed, a review of the recording shows that it began only after the Trooper had already made the u-turn from the opposite lane of traffic and was approaching the Defendant's car from behind.  Ex. 3.

Upon approaching the car and starting to speak with the Defendant, who was driving, the Trooper smelled a strong odor of marijuana coming from inside the car.  *Id.* at 15.  Trooper Grier also noticed R.W. lying down in the passenger seat.  *Id.* at 14-15.

The Trooper took the Defendant's identification information and conducted checks through his computer system.  *Id.* at 16.  Trooper Grier learned that Defendant was wanted in Norcross, Georgia on an active warrant.  *Id.*  The Trooper contacted the Norcross police, who confirmed that the warrant was valid and that

---

[2] References to certain segments of the recording will rely on the clock timer that appears in the video player.  (E.g., "17:00-17:15")

they would come pick up the Defendant. *Id.* at 16-17. Trooper Grier then requested backup to help investigate the possible marijuana use and to arrest the Defendant on the Norcross warrant. *Id.* at 17-18. Greene County[3], Georgia Sheriff's Deputy Zach Tanner arrived shortly thereafter to assist. *Id.* at 19. Trooper Grier asked Defendant to leave his car, placed him in handcuffs, and read him his *Miranda* rights from a card he carried. *Id.* at 19-22, Ex. 15 (*Miranda* card). Grier believed that the Defendant understood his rights, and the Defendant stated that he did understand both orally and by executing a written waiver. *Id.* at 22; Ex. 5 (signed *Miranda* waiver). The Defendant then indicated he was willing to speak. *Id.* at 22-23. The Defendant also later orally consented to a search of the car. *Id.* at 28.

Upon searching the car, Trooper Grier found marijuana, and also "a large amount of lingerie, an excessive amount of condoms, a sex toy and a pill bottle with the name R.W. on it." *Id.* at 35-36. Trooper Grier spoke with R.W. and obtained her identity information. *See* Ex. 3, at (approx.) 17:00-17:30. She gave her full, apparently correct, name at that time. *Id.* However, according to the DVD recording, when Trooper Grier originally approached the passenger side of the car, he appears to have heard the passenger say that her name was "Miranda." *See* Ex.

---

[3] By the point Grier actually pulled Defendant over, they had traveled from Taliaferro County into Greene County.

3, at (approx) 11:00.  What R.W. actually said is not audible and Trooper Grier

was not asked during the hearing about this.  *Id.*  But after asking the passenger for

her name, he appeared to repeat back the name "Miranda?" as if that had been was

he was just told.  *Id.*

Trooper Grier did testify, however, that R.W. appeared scared.  *See* Tr. at 30.

There were other things that R.W. told Trooper Grier at the scene that he

believed "did not add up."  Tr. at 37-38.  When asked about where they were

traveling to and why:

> The passenger R.W. had stated to me at first that she was -- Mr. Kelly
> was giving her a ride back to Birmingham but they were coming -- that
> they had been in Atlanta and then going to Augusta and then back to
> Birmingham and she said she just caught a ride with him because she
> was staying in Atlanta.

*Id.*  This did not "add up," among other reasons, because Trooper Grier had found

a bus ticket attached to a piece of R.W.'s luggage that indicated she had been in

Louisiana just a few days earlier.  *Id.*  When asked about this, "[s]he stated that she

had been in a fight with her mother and that she had rode with friends from

Alabama, from Birmingham to Louisiana, that she had a friend that drove from

Alabama to Louisiana to work every day."  *Id.*  During these comments, R.W. did

not state that she was being transported or forced to engage in sex against her will

or that she was traveling with the Defendant for the purposes of prostitution.

However, after having been separated from the Defendant, another officer

(Greene County Deputy Paquette) asked her if she was being forced to do something she did not want to do and she stated that she was.  *Id.* at 106, 110.

B.    *Subsequent Search Warrants*

On February 12, 2013, Special Agent Renea Green of the Georgia Bureau of Investigation obtained a search warrant from the Superior Court of Taliaferro County, Georgia, authorizing the further search of Defendant's car.  Tr. at 129-130; Exs. 8 and 8A.  S/A Green's affidavit was based in substantial part on an extensive interview conducted with R.W. on the afternoon on January 9, 2013, after the traffic stop.  Ex. 8A at SW-37.  According to the Affidavit, R.W. explained that she (R.W.) was a prostitute, and that Defendant trafficked her and other minor girls for purposes of commercial sex.  *Id.*  R.W. provided specific details about the ways in which the Defendant trafficked her for prostitution, including the internet website on which he posted photographic advertisements for her, and the Defendant's method of payment for those advertisements (a pre-paid Visa card). *Id.*  While R.W. did not say that Defendant forced her to prostitute herself, according to the Affidavit at some point he became physically abusive towards her, punched her, and threatened to kill her if she ran away.  *Id.*  R.W. relayed a particular incident in Louisiana shortly before the traffic stop in which she called the police on Defendant for punching her in the stomach, and then fled to her mother's house in Alabama via bus.  *Id.*  According to R.W., the Defendant then

found her in her Alabama, forced her into the car, and forced her to have sex with him at a hotel and to engage in prostitution.  *Id.*  at SW-37 – SW-38.  Apparently these were the events culminating in R.W. being found in the car with Defendant on January 9, 2013 on Interstate 20.  *Id.*  According to R.W., they were on their way back through Georgia to Jackson, Mississippi, "to check on the other girls." *Id.*

According to the affidavit, Officer Paquette told S/A Green that R.W. told him that Defendant "forced her to do things she didn't want to do and was afraid of [him]," and that he had forced her to engage in prostitution "and kidnapped her." *Id.* at SW-37.  The search warrant application did not mention whether R.W. may have initially provided a false name, such as "Miranda," to Trooper Grier.  Nor did the application state that R.W. gave an apparently contradictory story, that did not include any assertions of sex trafficking, kidnapping, or use of force or threats, to Trooper Grier at the side of the road.  *See* Ex. 8-A.  According to the application, S/A Green independently verified several details from R.W.'s interview.  *Id.* at SW-38 – SW-39.  She confirmed that the rental car driven by Defendant belonged to a rental car facility in Louisiana and was rented in Jackson, MS.  *Id.*  She also stated that she saw a Visa card in plain view sitting in the front passenger seat of the car.  *Id.*

Approximately one month later, on March 13, 2013, Special Agent Nathan

G. Whiteman with the Federal Bureau of Investigation obtained a search warrant from the undersigned U.S. Magistrate Judge, to search a cellular phone that was allegedly seized from the Defendant incident to his arrest. *See* Exs. 11, 11-A. The federal warrant application re-stated the details of S/A Green's earlier state warrant application, although with certain additional details including the fact that Trooper Grier's consent search revealed sex toys, condoms and lingerie. *Id.* ¶ 6. This warrant was executed on March 14, 2013. Tr. at 146.

      C.    *R.W.'s Later Partial Recantation*

On March 19, 2013, five days after the federal warrant was executed and over a month after the state warrant was executed, S/As Green and Whiteman conducted another interview with R.W. Tr. at 131-132. R.W. also provided a lengthy letter to the agents. *Id.* In her oral statements in this interview, and in the letter, R.W. recanted her prior statements that Defendant had kidnapped and forced her into the car, and had punched her in Louisiana. *Id.* at 133-134; Ex. 10 (Letter). R.W. stated that she "wasn't being held against her will at all," and she stated that she had lied in that regard during her initial interview. Doc. 10 at GBI-371. She did not, however, recant her statements about being engaged in prostitution, and about the Defendant's role managing her as a prostitute. In fact, she stated things like "I knew he was a pimp," but "I already knew what I was getting myself into...." *Id.*

By this juncture, both the federal and state search warrants had been obtained and executed.  Agents Green and Whiteman testified that they were unaware that R.W. would recant portions of her story at the time they applied for the warrants, and they believed at the time that everything contained in their affidavits was true and correct.  Tr. 38 at 130, 154.

## ANALYSIS

## I.      RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

   A.     *Probable Cause Justified Trooper Grier's Traffic Stop And The Fruits Of The Stop Should Not Be Suppressed*

A state trooper may stop and briefly detain a vehicle based on probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810-812 (1996); *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).  Here, Trooper Grier testified that he was trained to recognize speeding, and that he saw Defendant speeding in excess of the 70 mile per hour limit.  Tr. at 13. Trooper Grier further explained that his radar device confirmed his personal observation, that is, that Defendant was traveling at 85 miles per hour.  *Id.*

Defendant argues that Trooper Grier's testimony is incredible to the extent he claimed to be able to judge the speed of Defendant's car while traveling in the opposite direction.  Defendant also argues, based on the video recording, that "[t]here are several trucks blocking [Defendant's] way such that it could not be

possible for Mr. Kelly to engage in excessive speeding." Def. Mem. [52] at 3.

Defendant also points to the lack of any documentation of the radar gun's findings,

and speculates that Trooper Grier may have been pre-disposed to arrest Defendant

because Grier described him to another officer as a "good sized boy." *Id.*

The Government bears the burden of presenting facts to establish that the

traffic stop is supported by reasonable suspicion or probable cause. *See Welsh v.*

*Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506,

1517 n. 21, 1520 (11th Cir.1991). Here, the Government has met that burden.[4]

Trooper Grier explained that he received training as to how to visually estimate a

vehicle's speed, and his visual observation was then confirmed by the radar gun.

Certainly, a printout or other documentation showing the radar results would have

further corroborated Trooper Grier's testimony. But such additional evidence was

not necessary, because Trooper Grier's testimony was credible based on the

Court's personal observation of the testimony including the witness's responses to

cross-examination. Indeed, Defendant points to no reason why Trooper Grier

would have gone to the trouble of pulling into the median, turning into the

---

[4] The Government does not concede that probable cause is required, as
police officers are authorized to stop and briefly detain vehicles based on
reasonable suspicion of criminal activity, including traffic law violations. *See*
*United States v. Clark*, 337 F.3d 1282, 1285-88 (11th Cir. 2003). This distinction
is irrelevant here because Trooper Grier had a proper basis to stop Defendant's car
under the probable cause or reasonable suspicion standard.

oncoming lane of traffic, weaving through several vehicles to catch up to the Defendant's car, pulling over an individual he did not know, without actually observing any violation.[5]

Defendant's principal argument is that the video recording shows no speeding violation and, in fact, shows that trucks were blocking Defendant's way such that he could not have been speeding. The Court rejects this argument. Trooper Grier testified that the recording only activated once he was in actual pursuit. Tr. at 97. By that time, the Defendant had caught up to the trucks ahead of him. *Id.* That is not inconsistent with Trooper Grier's testimony that the Defendant was previously speeding and weaving in and out of traffic. Tr. at 12-14.

Thus, probable cause justified the stop. Defendant's only argument to suppress the fruits of the stop is based on the purported lack of probable cause. Defendant does not otherwise challenge the voluntariness of his *Miranda* waiver or his consent to the search.[6] Because the stop was legal, therefore, Defendant's

---

[5] Defendant does not explain how Trooper Grier's later description of the Defendant as "a good sized boy" suggests that Trooper Grier's testimony is incredible. Defendant suggests without any explanation that this comment revealed that Grier "may have had personal motives for making the stop." Def. Mem. [52] at 3. There is no basis for this speculation. Among other things, the record does not support the inference that Trooper Grier, traveling in the opposite direction, actually perceived the Defendant's size while he was sitting inside his car, and made a split-second decision to initiate the stop on that basis.

[6] As detailed above, in the statement of facts, the Government nevertheless adduced evidence showing that Defendant was furnished *Miranda* warnings prior

argument fails.

B.   *The Search Warrants Were Valid*

Probable cause to support a search warrant exists when, under the totality of the circumstances set forth in the supporting affidavit, there is a fair probability that contraband or evidence of a crime will be found in a given location. *See Illinois v. Gates*, 462 U.S. 213, 241 (1983).   Among the circumstances that must be considered by the issuing judicial officer are facts relating to the reliability–including the veracity and basis of knowledge–of individuals supplying hearsay information to the officer applying for the warrant. *Id.*

However, there is no absolute requirement that an informant's information be independently corroborated if the warrant application otherwise sets out sufficient information to assess the basis of the informant's knowledge and his or her reliability. *United States v. Brundidge*, 170 F.3d 1350 (11th Cir. 1999).  Also, if a search warrant application relies on information provided from an alleged crime victim, that information is viewed with less skepticism than information supplied by an informant. *See United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006).

The federal and state search warrants in this case were issued based in major

---

to any interrogation, that he waived his *Miranda* rights, and that he consented to the search.

part on the information provided by R.W. to S/A Green on the afternoon of

January 9, 2013.  Defendant does not argue based on the information contained

within the search warrant applications themselves that R.W.'s information should

have been rejected as unreliable.  Rather, Defendant argues that R.W.'s

information should now, in retrospect, be deemed unreliable based on additional

facts not included within the search warrant applications.  *See* Def. Mem. [52] at 4-

5.

Specifically, Defendant points out that R.W. recanted certain of the most

serious aspects of the information she provided to law enforcement, in her letter

and interview of March 19, 2013.  Def. Mem. [52] at 4-5.  Defendant also argues

that R.W. made false or inconsistent statements during the traffic stop itself,

including possibly referring to herself as "Miranda," and relaying an account of her

travel that omitted any admission of prostitution or allegation of being kidnapped

or threatened by the Defendant. *Id.*  None of these statements are reflected in the

search warrant applications.

Generally, a challenge to the issuance of a search warrant is limited to the

sufficiency of the information contained within the four corners of the warrant

application itself. *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002).

Defendant cites no authority and articulates no particular legal theory for the

proposition that the Court can review the reliability of R.W.'s information in

retrospect, based on facts not contained within the warrant applications.

Nevertheless, the Court considers that the Defendant may be attempting to lodge a challenge under *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, Defendant may be arguing that the agents purposefully or recklessly omitted key facts that would have shown the informant to be unreliable. According to *Franks*, 438 U.S. at 154, and its progeny, suppression may be warranted if the search warrant applicant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard, as to a material fact. *United States v. Reid*, 69 F.3d 1109 (11th Cir. 1995); *United States v. Glinton*. 154 F.3d 1245 (11th Cir. 1998).

If such misstatements were made, the Court is to excise that material from the warrant application, and determine whether the remainder is sufficient to establish probable cause. If not, the warrant must be voided and the fruits of its execution are to be suppressed. *Franks*, 438 U.S. at 154. Allegations of material omissions are to be treated similarly to claims of material misstatements. *See United States v. Park*, 531 F.2d 754, 758-759 (5th Cir. 1976). In other words, the Court is to consider *de novo* whether, had the omitted information been included, the affidavit as a whole would have been insufficient to establish probable cause.

Applying the *Franks* analysis here (*sua sponte*, because the Defendant does not expressly make a *Franks* argument), there is no basis to suppress any evidence.

At the outset, R.W.'s recantation is not a basis to suppress under *Franks* or otherwise.  This information was provided to law enforcement ***after*** S/As Green and Whiteman prepared their affidavits, obtained the warrants, and executed them. Both S/As Green and Whiteman testified that they believed at the time they obtained and executed their warrants that the information contained in their affidavits was accurate.  Defendant points to nothing in the record to refute these statements, and in fact makes no specific legal argument on this issue at all.   The Court does not glean any indication in this record that the agents presented R.W.'s information knowing or in reckless disregard of the fact that R.W. might recant part of it later.[7]

---

[7] Moreover, even if the recanted allegations were excised, the warrant application would still establish probable cause of the crimes relied upon and that evidence would be found at the premises to be searched.  R.W. recanted that Defendant hit her and kidnapped her, but did not recant that he was harboring and transporting her for commercial sex.  In light of R.W.'s age, the remaining information would still have established the crime of trafficking for sexual servitude, in violation of O.C.G.A. § 16-5-46, which was the crime upon which the state warrant was based.  This statute makes it a crime to "knowingly subject[] another person to or maintain[] another person in sexual servitude or knowingly recruit[], entice[], harbor[], transport[], provide[], or obtain[] by any means another person for the purpose of sexual servitude," which is defined as including "any sexually explicit conduct or performance involving sexually explicit conduct which is performed or provided by any person ... under the age of 18 years" This statute does not require a finding of coercion to sustain a conviction.  The same is true with regard to the federal charges identified in the warrant, 18 U.S.C. §§ 1591(a) and 2421, which among other things provide that trafficking an individual for commercial sex below the age of 18 in interstate commerce is illegal, whether coerced or not.

As to the Defendant's possible misstatement of her name at the traffic stop, there is no evidence that the search warrant affiants were aware of that either.  In fact, whatever R.W. initially told Trooper Grier as he was leaning into the passenger window is not audible on the recording.  All that the Court can conclude is that Trooper Grier appeared to hear her say "Miranda," because he appeared to repeat that name after asking her identity.  *See* Ex. 3 at (approx.) 11:00.  The Court does not make the inferential leap that S/As Green or Whiteman when signing their affidavits were aware or recklessly disregarded that R.W. might have initially referred to herself as "Miranda."

The same is true with regard to R.W.'s initial descriptions of her travel to the troopers.  The Defendant cites the recording of the traffic stop as evidence of what R.W. initially said.  There was no evidence that S/As Green or Whiteman had reviewed this recording when they swore to their affidavits.  And the undersigned does not find–and Defendant makes no particular argument–that the agents would have been reckless in not doing so.

In any event, even if these statements, including R.W.'s possible reference to herself as "Miranda," were included in the warrant applications, probable cause still would have existed.  The judge issuing the warrants would have assessed the reliability of the information presented based on the totality of the facts and circumstances.  Here, the warrant applications included substantial information

weighing in favor of reliability that, even with the omitted information, would still have justified issuance of the warrants.[8]

First, obviously R.W. had a first-hand basis of knowledge for the events she attested to.  Nearly everything she relayed to S/A Green was based on her own interactions with the Defendant, her own observations, and her own conduct.

Second, the very detailed statement by R.W. to S/A Green, itemizing specific details about her travels and prostitution activities, weighs in favor of reliability. *See United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993) ("the affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched or the items to be seized.")  R.W. provided specific names of websites on which Defendant advertised her sexual services, specific methods by which Defendant paid for her prostitution advertisements,

---

[8] *See*, *generally*, *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir.1987) (omission of informant's criminal record and fact that informant was in custody did not invalidate warrant because the affidavit detailed prior use of informant on at least 14 occasions over 12 years); *United States v. Singleton*, 125 F.3d 1097, 1103–04 (7th Cir.1997) (omission of informant's criminal history, that informant was on disability because of mental retardation and was a former mental patient suffering from mental illness from affidavit "of little consequence" where there was "independent, often contemporaneous, police corroboration," including audio corroboration of informant's controlled buys); *United States v. Huggins*, 299 F.3d 1039, 1046 (9th Cir.2002) ("failure to disclose that the informant was in custody and trying to secure a plea bargain" not a material omission in light of significant police corroboration of the informant's statement and fact that "the affidavit did state, forthrightly, that the reliability of the informant was untested").

specific details about cities he brought her to for prostitution, and a detailed explanation about how she got involved with him. The level of detail alone would have been a substantial factor weighing in favor of the reliability of R.W.'s information.

Third, also weighing in favor of reliability was that several of these statements, which suggested R.W. willingly engaged in prostitution, were against her own penal interest. *See United States v. Miller*, 673 F.3d 688, 694 (7th Cir. 2012) (finding even "generic" statements by an informant were sufficiently reliability for purposes of agents' good faith reliance, in part because the statements "were likely against the informant's penal interest.")

Fourth, certain details of R.W.'s story had been corroborated. This included rental car records that corroborated the travel itinerary, and S/A Green's plain view observance of a Visa card (the same brand of card that according to R.W. Defendant used to pay for prostitution advertisements). In the case of the federal warrant, S/A Whiteman's affidavit also included the fact that condoms, lingerie and sex toys were found during the consent search of the car.

The omitted statements from the traffic stop would have been weighed against these factors strongly suggesting reliability. That R.W. may have initially referred to herself as "Miranda," or at least said something that Trooper Grier heard as "Miranda," would have been insignificant in the context of the

information presented as a whole.  That R.W. may have initially furnished a story about their travel that omitted any statements about prostitution, illegal sex, or kidnapping, while not insignificant, would not have required rejection of the warrant either.  This information would have been evaluated in context, including that this was a minor, showing signs of fear, reacting to being pulled over on the side of the road, and who had been engaging in criminal acts herself.  Had this information been included, the affidavit as a whole would still have been sufficient to establish probable cause.

Thus, the evidence reveals no basis for suppressing evidence obtained from the search warrants.  It is **RECOMMENDED** that Defendant's Motion to Suppress [28] be **DENIED**.

## II.   RECOMMENDATIONS ON DEFENDANT'S MOTIONS TO DISMISS

Defendant has filed two related Motions to Dismiss [18][25], both of which attack the sufficiency of the factual allegations in the Indictment.  It appears that Defendant may have intended the Second Motion to Dismiss [25] to supersede and replace the First Motion [18], but out of an abundance of caution the Court will discuss both motions separately.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the

accusation." This constitutional protection is implemented by the requirement of Rule 7(c)(1), Fed.R.Evid., that the indictment or information "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  An indictment is considered legally sufficient under Rule 7(c)(1) if it "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."  *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009).  Nevertheless, although an indictment must allege the essential facts constituting the offense, it generally need not disclose the specific proof or conduct that will be used to prove those factual allegations.  *See United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990) ("[T]he government is under no duty to provide defendant with all overt acts that might be proven at trial.").

A.    *The First Motion to Dismiss [18]*

The First Motion to Dismiss [18] argues that Count One fails "to make a showing of [a violation of 18 U.S.C. § 1591(a)(2)] such as Mr. Kelly receiving benefits, financially or otherwise in addition to the lack of a showing a [sic.] force or threats of force, fraud or coercion."  Motion [18] at 1.  This argument fails for the basic reason that the Indictment does not charge a violation of Section 1591(a)(2).  Rather, the Indictment charges an alternative way of violating the

statute under Section 1591(a)(1) that requires no allegation or proof of financial

benefit or force or coercion.[9]

According to the statute (emphasis added):

Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; *or*

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, *or* that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

The use of the disjunctive "or" in numerous places makes clear that the

statute may be violated in different ways.  The first element of the statute may be

---

[9] Count One charges that:

Beginning on or about November 22, 2012, and continuing until January 9, 2013, in the Northern District of Georgia and elsewhere, the defendant, JOHNATHON KELLY, did knowingly recruit, entice, harbor, transport, provide, obtain, and maintain by any means, in and affecting interstate commerce, "R.W.," knowing and in reckless disregard of the fact that "R.W." had not attained the age of 18 years and would be caused to engage in a commercial sex act, all in violation of Title 18, United States Code, Sections 1591(a) and (b)(2).

violated if a defendant *either* transports, harbors, entices, etc., an alleged victim in or affecting interstate commerce *or* benefits financially from such a venture. The Indictment clearly alleges the first of these two options. In other words, the Indictment specifies which of the two alternative ways in which the Defendant is alleged to have violated this first element. That the Indictment did not also allege that the Defendant benefitted financially in violation of Subsection (b)(2) simply narrows the Government's theory of prosecution. This omission is not a defect in the Indictment because the statute can be violated without such facts.

Similarly, the second element is met if the Defendant knows or recklessly disregards *either* that force, threats of force, fraud, etc., will be used to cause the alleged victim to engage in a commercial sex act, *or* that the alleged victim is younger than 18 years old and will be caused to engage in a commercial sex act. Again, the Indictment clearly chooses the second of these two options. The Defendant allegedly violated the statute not by forcing or threatening an individual to commit prostitution, but by knowing that the individual he was harboring and transporting was a minor who was engaged in prostitution. Again, the Indictment simply reflects a narrowing of the theory by which the Government asserts the Defendant violated Section 1591(a). No allegations of force or threats are required to sustain the sufficiency of the Indictment.

As to Count Two, Defendant argues that the Indictment insufficiently

alleged the required scienter.  The statute, 18 U.S.C. § 2423(a), prohibits a person from knowingly transporting an individual below the age of 18 in interstate or foreign commerce, with the intent that the minor will engage in prostitution or other criminal sexual activity.  Defendant does not appear to argue that the Indictment state that he acted with the necessary level of intent.  Rather, he argues that the assertion of intent is conclusory, and that the Indictment "fails to allege ***acts that show an intent*** on behalf of Mr. Kelly to violate that statute."  Motion [18] at 1 (emphasis added).

This argument is meritless and betrays a misunderstanding of the pleading rules.  While an Indictment must allege the essential facts constituting the offense, the Indictment need not identify the supporting proof that will be relied upon at trial to establish those facts.  Here, the essential fact is that  Defendant had the specific intent charged in the Indictment.  The "acts that show" this intent are not themselves the essential facts of the crime, but rather the evidence and supporting proof that the Government may introduce at trial to prove the essential fact charged.  The Indictment is not required to include this detail.  *See Martell*, 906 F.2d at 558 (11th Cir. 1990).

Thus, the Court **RECOMMENDS** that Defendant's First Motion to Dismiss [18] be **DENIED**.

B.    *The Second Motion to Dismiss [25]*

The Second Motion to Dismiss makes the overlapping but more expansive argument that "[t]he indictment as a whole is legally insufficient as a whole because there are absolutely no facts alleged in either count." The Defendant cites *United States v. Schmitz*, 634 F.3d 1247, 1261 (11th Cir. 2011) as authority.

The Defendant's argument that "no facts [are] alleged" is not correct. The Indictment, while not extensive, does allege various specific facts. Both counts allege that the crimes occurred during an approximate six-week period, that conduct occurred in this District, that a specific individual identified as R.W. was the victim, that Defendant knew that R.W. was younger than 18 and would be engaging in commercial sex acts, and that Defendant harbored and transported her as part of this venture. These are facts, and they appear to constitute at least the bare minimum facts that comprise the crime charged. To the extent Defendant wishes disclosure of overt acts or evidence supporting those facts, as explained above, this detail is not generally required under Fed.R.Crim.P. 7(c)(1).

The Court also finds *Schmitz* to be distinguishable. The charge at issue in that case stated little more than that an employee of a federally-funded program committed theft and embezzlement by simply taking her own salary and benefits. *Schmitz*, 634 F.3d at 1261. The language of the charge did not explain how the common and typically innocent act of drawing one's own salary could be theft. In

that context, the Court of Appeals stated that the indictment lacked sufficient factual support.  Indeed, the Government on appeal did not appear to argue that the language of the embezzlement count was in itself sufficient.  Rather, it argued that the Court should look to the indictment as a whole, including mail fraud counts that explained how the defendant engaged in no actual work and falsified time sheets to make it appear that she had.  *Id.* at 1260.  The Court rejected this because, technically, the language of the embezzlement count did not incorporate any of these earlier factual allegations including those supporting the mail fraud counts.  *Id.* at 1261.  In this very different context, the Court of Appeals found the embezzlement charge in *Schmitz* to require more explanation.

By contrast, the Indictment here alleges what crimes the Defendant committed, generally what he did, the victim, his scienter, and the time frame in which he committed the crimes.  The Court finds that the indictment alleges the essential facts necessary to charge the violations at issue and **RECOMMENDS** that Defendant's Second Motion to Dismiss should be **DENIED**.

## III.   ORDER ON MOTION FOR BILL OF PARTICULARS

Separately from Defendant's Motions to Dismiss, he also has filed a Motion for Bill of Particulars [17] under Fed. R. Crim. P. 7(f) seeking further specification of the acts that he allegedly committed.  Although related to his complaints about the insufficiency of the Indictment, a bill of particulars is a separate remedy that

can be required even if an indictment contains the bare minimum to survive dismissal. Indeed, Rule 7(f) presupposes a valid indictment or charge against the defendant. *See United States v. Carrier*, 672 F.2d 300, 303 (2nd Cir. 1982) ("A bill of particulars may not save an invalid indictment[.]").

The purpose of a true bill of particulars is threefold: "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985) (citations omitted). A bill of particulars, properly viewed, supplements an indictment by providing the defendant with information necessary for trial preparation even if not required to be included in the indictment itself. *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (italics in original). Even if in providing those details in a bill of particulars, the government's evidence or theories are somehow disclosed, the bill of particulars is still proper if necessary to allow adequate trial preparation. *United States v. Thevis*, 474 F.Supp. 117, 123 (N.D. Ga. 1979); *United States v. Smith, supra*; Wright, Federal Practice and Procedure Criminal 2d § 129.

Generalized discovery, however, is not an appropriate function of a bill of particulars and is not a proper purpose in seeking the bill. *Id.,* at 1442; *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981). Similarly, the Eleventh

Circuit has held that a bill of particulars should not "automatically [be] accorded the status of a supplement to an indictment."   *Anderson*, 799 F.2d at 1442. Furthermore, a defendant is not entitled to a bill of particulars "with respect to information which is already available through other sources," including discovery. *Martell*, 906 F.2d 555, 558 (11th Cir. 1990); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds*, 801 F.2d 378 (11th  Cir. 1986).

The two paragraph Indictment includes little more than the bare facts that define the crimes charged.  The Indictment states that the crimes occurred in "the Northern District of Georgia and elsewhere" without any indication of the geographic scope of the conduct.  The Indictment stated that the crimes at issue occurred over a six week period, without any indication as to what specifically Defendant did to prostitute R.W., where he did it, and when.  Viewing the Indictment alone, although it is sufficient to survive dismissal, the Court would be sympathetic to the need for some further specification to allow for trial preparation.

Notably, however, the Defendant's Motion is equally bare bones.  It is four sentences long.  It simply says "[t]he indictment fails to specify what acts that Mr. Kelly is alleged to have completed" in each of the counts, without citing any authority or any explanation for why the information he seeks is unavailable through other sources including discovery.  Motion [17] at 1.  Indeed, Defendant's motion does not even state that he needs this information and why.  Defendant

rather simply asserts that he is entitled to a bill of particulars because the Indictment does not allege all overt acts establishing the commission of the crime. This is not the standard under Rule 7(f).

In the end, the Court must look to the Government's discovery disclosures in assessing Defendant's need for particulars.  Here, as noted above, the record includes federal and state search warrant applications that set forth in substantially greater detail the results of the Government's investigation at the time those affidavits were presented.  These affidavits were based in substantial part on the initial statements of R.W., and she has since recanted a portion of those allegations. But the Defendant has also been furnished R.W.'s handwritten letter, which explains what aspects of her prior statements she was recanting, and otherwise provided further details as to the Defendant's conduct.  The Government also represents that it has produced other documentary evidence showing certain specific times, locations and methods by which Defendant promoted R.W.'s prostitution, including hotel receipts and internet advertisements.

Thus, the materials provided to the Defendant disclose, among other things, specific trips in which he transported R.W., specific ways in which he advertised her services, and a detailed description of the Defendant's activities with R.W. during the relevant period.  Defendant does not explain why this information is inadequate to help him understand what issues he needs to address at trial and to

avoid undue surprise.  Those purposes appear to the Court to be well served by this detailed discovery.

Moreover, Defendant already has sufficient protection against double jeopardy.  The Indictment clearly charges him with violating two specific sex trafficking statutes with regard to a specifically identified victim during a six-week period of time.  The Indictment itself would protect Defendant from being prosecuted again in violation of the Double Jeopardy clause for those same charges during that period against R.W.  A bill of particulars is unnecessary for this purpose, either.

Thus, the Court **DENIES** Defendant's Motion for Bill of Particulars [17].

## **CONCLUSION**

For the reasons explained above, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence [28], and Motions to Dismiss [18] [25], be **DENIED**.

The Court also **DENIES** Defendant's Motion for Bill of Particulars [17].

With no other pretrial matters pending, this case is **READY FOR TRIAL**.

**IT IS SO ORDERED** this 31st day of  January, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE